[No. 6,981—Department One.]
March 29, 1882.

## PAUL ROUSSET *v.* J. W. REAY ET AL.

EJECTMENT—OUTSIDE LANDS OF SAN FRANCISCO—ORDER No. 866 OF THE BOARD OF SUPERVISORS.—Ejectment for land forming part of the "outside lands" of San Francisco. (Complaint filed Sept. 16, 1873.) The plaintiff deraigned title under deed from the City and County of San Francisco—dated April 5, 1870—issued in pursuance of proceedings taken under Order No. 866 prior to the passage of the Act of April 14, 1870, "*to expedite the settlement of land titles in the City and County of San Francisco.*" (Stat. 1869–70, 353.)

   *Held:* In effect, Order 866 was ratified and re-enacted by the Act referred to. The deeds under which the plaintiff claims were therefore valid.

ID.—FINDINGS—POSSESSION OF DEFENDANT.—The finding of the Court of possession by the defendants was justified by the evidence.

ID.—ID.—STATUTE OF LIMITATIONS—PLEADING.—The defendants pleaded that the plaintiff's cause of action was barred by § 318 and by § 319 of the Code of Civil Procedure, and the Court found "that the plaintiff was and has been at all times since the sixth of April, 1870, seised in fee simple, and the owner of and entitled to the possession of" the lands in controversy; and "that the said defendants had prior to the commencement of this action been in the possession of the said pieces and parcels of land at no time prior to the nineteenth of May, 1870."

   *Held:* If there was a plea of the statute of limitations the finding covered it.

APPEAL by defendants, Peter McGrath and Edward Roper, from a judgment for the plaintiff in the Fifteenth District Court, City and County of San Francisco. DWINELLE, J.

The evidence with reference to the possession of the defendants, at the time of bringing the suit, was substantially as follows: Samuel Crim, defendant, called for plaintiff, sworn:

I am one of the defendants and know the premises described in this complaint, and a deed that has just been offered. I have known it since 1868—about that time; it is part of the property I was put into possession of by the Sheriff in May, 1870. * * * About the time I was put in possession I gave a lease to other parties; the lease is dated May 19, 1870. I remained in possession from that time up —that is, I thought I was in possession up to some time in 1872, or up to the present time. I gave Peter McGrath, defendant and Mallory a lease; they were then at that time in possession. * * *

Q. How long did they remain in possession as your tenants?

A. That is, I consider they remained.

Mr. Seawell.—State what you know and saw.

A. I don't know anything positively about it, except I was under the impression they were in possession up to the present time; in the mean time there was a lease made. I deeded the property, a certain portion of it, to Mr. Roper, defendant, the next day, the next day after the lease.

Plaintiff's counsel here presented to the witness a deed from Samuel Crim to Edward Roper, bearing date the twentieth day of May, 1870, and recorded the fourteenth day of October, 1870, in the Recorder's office of the City and County of San Francisco, by which deed said Samuel Crim granted and conveyed to said Edward Roper all his (Crim's) right, title and interest, in and to the premises described in said lease to McGrath, excepting and reserving blocks 757, 684 and 780. I had placed those folks (McGrath and Mallory) in possession at the time; that is, the deed I gave, or the lease.

Q. Did you ever make any improvement on these three blocks, if so, what were they?

A. Not any, sir; they are enclosed by a fence, I think a three-rail fence, and there were two houses on it the time I was put into possession; they are not enclosed by themselves, they are within the large enclosure.

    *       *       *       *       *       *       *

Q. Is that the same land embraced in that lease?

A. Yes, sir, that is what I understand it to be; of course the lease to Peter McGrath and Mallory, dated May 19, 1870.

    *       *       *       *       *       *       *

Q. Was it fenced when you were put in possession?

A. Yes, sir; at least there was a fence there.   *  *  * I know Mr. Reilly; he lives within the large enclosure of the land embraced in the lease; the two houses which were upon this larger enclosure were occupied, one by Mr. McGrath, and the other by Mallory, when I put them into possession.

    *       *       *       *       *       *       *

Plaintiff's counsel read in evidence a deed from J. W. Reay and Edward Roper to Samuel Crim, dated the first day of June, 1870, for blocks 757, 684 and 780, acknowledged June 6, 1870, and recorded on the second day of November, 1874.

The Court.—Had you tenants there ?

A.    Yes; in common with the other property under this lease and the lease by Roper to Wm. McGrath.

Q.    You speak of there having been two houses, one of which is burnt, is the other house still standing there?

A.    As to the burning I won't be positive, but it was removed any way ; that is my impression.

Q.    The other house ; is it still standing ?

A.    Yes, sir; on the right hand side of the road; at least it was the last time I was out.   I have not been through there within the last month or so.

Q.    It has been standing there ever since you went into possession in 1870 ?

A.    Yes, sir.

Q.    You say the McGrath house stood on the right hand side ?

A.    On the right hand side as you are going out.

Q.    Who was occupying it the last time you were there ?

A.    Mr. McGrath.

The Court.—Q.   Peter McGrath ?

A.    I saw him there ; yes, sir.

Mr. Harrison.—Q.   When was that?

A.    Well, probably.   Probably something over a year ago; it might have been inside of that time ; that is, I saw him at the house; that is, he was outside and spoke to me; I stopped and talked with him a few minutes.   Whether or not he was occupying the house I do not know, no more than he was there during that time.

Q.    Who else did you see there ?

A.    I cannot say I saw any one just at that time; no doubt that his family was there.

*        *        *        *        *        *        *        *

Q.    Have you paid the taxes upon those three blocks ?

A.    Yes, I judge we have paid the taxes on the most of it; we did not on all of it.

The Court.—Q.   At what time ?

A.    At the regular time.

Q.    Up to the present time ?

A.    Oh, yes, up to the present time, we have paid our taxes regularly every year; that is, on the three blocks, at least our

proportion, other parties claiming it may have paid it on their portion.

\*      \*      \*      \*      \*      \*      \*

Q.   You said that the property you were put in possession of by the Sheriff was known as the Elsessor Tract?

A.   Yes, sir; it was purchased by John Treat (defendant); he kept a milk ranch there before; that is, Treat and I together purchased; I had an interest in it and he had one. Treat made the purchase of this property in 1868.   He and I were joint purchasers of the tract.   He owned, say two thirds of it..   I was interested with him and furnished the money, and the tract was deeded to me.   It never stood in his name, but he owned two thirds of it.

I wish to make an explanation of my testimony where I stated I had tenants there in common with other property under this lease.   What I meant by that is, it was held in one tract.   When I passed the deed to Roper I did not have any control over that portion of the land at all; did not have any interest whatever in it.   What I meant by in common is that the parties holding for Roper had charge of my three blocks when I made the remark "common."   I meant the parties holding for Roper were keeping possession of my three blocks.

### CROSS-EXAMINATION.

Q.   You say that the parties holding for Roper were to keep possession of your three blocks?

A.   Yes, sir.

Q.   That is, the whole of the property was to be in a common enclosure?

A.   That is the possession as far as the possession is concerned; the parties holding possession for them were to hold possession of my three blocks.

Q.   That land was, as you stated, held in common?

A.   What I meant by that was, held under one fence; there was no separate enclosure, is what I meant by that.   I never had anything to do with the rest of that property since that deed; I made no claim to it, none whatever, except the three blocks.   I state now, under oath, that is all the interest I had in it; those three blocks.

Plaintiff's counsel offered and read in evidence a lease from Edward Roper to William McGrath, dated December 31, 1872.

\*       \*       \*       \*       \*       \*       \*

Peter McGrath, called for defendants, sworn.

Mr. Seawell.—Please look at that [handing witness the lease from Samuel Crim to Peter McGrath and Thomas Mallory] and see whether you executed it ?

A.   Yes, sir.

Q.   What did you do after this lease in reference to the property ?

A.   I lived there; I lived on one side and kept my stable on the other.

Q.   Was it all within one enclosure ?

A.   Well, there is a road runs between the two enclosures, but it is all in one enclosure, I think.

Q.   How long did you remain there ?

A.   I stopped there till 1871; the latter part of 1871; I changed my residence then up to Napa. The latter part of 1871 I came back, and went away again in 1872, and stopped there till September, 1873.

Q.   What did you do, if anything, with reference to this property before you left in 1872 ?

A.   I lived there. I was a tenant of Mr. Crim. I lived there and stabled my horse and raised a little vegetables.

Q.   When you left did you make any arrangement about the property ?

A.   I think I was away from it two years.

Q.   Were you there all the time or a part of the time, in Napa, from 1872 to 1873 ?

A.   I was there all the time; I had steady work; I was superintendent of the mine in Pope Valley; changed my papers and voted up there; paid my poll tax and road tax up there; I have got the receipts here for them.

\*       \*       \*       \*       \*       \*       \*

Q.   You came back in September, 1873 ?

A.   Yes, sir, the tenth, or eleventh, I believe; I went up the beginning of 1872. I was pretty near two years there altogether in Pope Valley, at the Quicksilver Mines, as Superintendent. When I came back I went out on the ranch.

Q.   What do you mean by that?

A.   On the land in dispute.

Q.   To the place you had been living before?

A.   Yes, sir.

Q.   Have you resided there ever since?

A.   Yes, sir.

Q.   Is that property still in one enclosure, still the same enclosure that was there when you first went there?

A.   No; there have been some alterations in it, lately.

Q.   Until within the last year, has it remained in about the same condition?

A.   About the same.

Q.   How much of a family have you living there now?

A.   I have two—two sons—William, who is thirty years old, and Peter who is nineteen; neither of them is married. I have a wife living with me there, the mother of these sons. My daughters are not living with me now, one is in Sacramento, and the other in San Francisco, she left the place shortly after I left.   They were not there when I came back. I left them there when I went away.   I left my wife there also, when I went to Napa, and I found her there when I got back.   She lived with her son there.   I am living in the same house I went to in 1868, and have resided there since, and my wife.

Q.   Your wife you found there when you got back, did you not?

A.   Yes, sir; she lived with her son there.   I have not seen Mallory for seven or eight years.

William McGrath, called for defendants, sworn:

I am the son of the last witness.

Q.   Please look at that paper, and tell if it was signed by you? [Handing witness lease from Roper to him.]

A.   Yes, sir, and by Edward Roper, in 1872.

Q.   What did you do with reference to the property after the execution of the lease?

A.   I fixed up the fences and I kept them up in good repair; and lived on the property, and have lived there since 1868 to the present time, and kept a horse and two cows.

Q.   Did you occupy it exclusively, or was there somebody else with you?

A.   I occupied that with my mother.   I was living there with her and my sister.

\*        \*        \*        \*        \*        \*        \*

Q.   How much rent did you ever pay under this lease?

A.   I have not paid any yet.

Q.   Were you ever asked to pay it?

A.   No, sir.   This lease was made after my father went to Napa.

Q.   Are you married?

A.   No, sir; never have been married.

Q.   Who was the housekeeper out there?

A.   Mother.

The Court.—Q.   While your father was in Napa?

A.   Yes, sir.

Mr. Harrison.—Q.   She had charge of the management of the house, did she?

\*        \*        \*        \*        \*        \*        \*

Q.   The furniture remained there, however?

A.   Yes, sir.

Q.   That is your father's furniture?

A.   Yes, sir; I don't think he has got much of it.

Q.   What?

A.   I don't think it belongs to him.

Q.   It is not yours, is it?

A.   No; I think it is mother's.

Q.   How often did your father visit you during the time?

A.   He used to come down about once a month or twice.

Q.   He used always to go there to stay, did he not?

A.   Yes, sir.

\*        \*        \*        \*        \*        \*        \*

Defendant's counsel offered and read in evidence a deed of the land in controversy from Edward Roper to Alfred W. Reay, dated March 8, 1873.

*J. M. Seawell,* for Appellants.

The deeds from Selby (Mayor) to plaintiff and to Slater, respectively, did not convey any title to the grantees.

The deed to plaintiff bears date April 5, 1870.   It recites that plaintiff filed his petition November 23, 1869, and that all the proceedings were had under and by virtue of Order

No. 866 of the Board of Supervisors. Order No. 866 was an order of the Board of Supervisors, passed April 29, 1869, providing the means of acquiring deeds from the city. It was never authorized by the Legislature, and it was never ratified by the Legislature. Without such ratification the Board of Supervisors had no power to legislate upon the subject. By the Act of Congress of March 8, 1866, the land was granted to the city in trust to convey the same to the parties then in possession, in such quantities and upon such terms and conditions as the Legislature should prescribe. It was, therefore, not for the Supervisors, but the Legislature, to give directions upon the subject. Accordingly, by the Act of March 24, 1870 (Statutes 1869–70, 353), power was for the first time conferred by the Legislature upon the Mayor and Board of Supervisors to determine who were the beneficiaries under the Act of Congress, and to execute a deed to them. Section 6 of that Act provides that proceedings instituted under Order No. 748 of the Board of Supervisors may be continued under the provisions of said Order No. 866, and that when the proceedings have been completed and the Committee on Outside Lands of the Board of Supervisors have executed a deed, the grantee may obtain a deed from the Mayor, without further petition or proof; but the section cited does not apply to proceedings wholly begun, continued, and ended under Order No. 866.

The deeds from the Mayor having been executed without authority of law, their validity may be impeached collaterally in an action of ejectment. (*McGarrahan* v. *New Idria Mining Co.* 49 Cal. 335 ; *Parker* v. *Duff,* 47 Cal. 562, and cases cited.)

Neither of the appellants were in possession of any part of the premises sued for at the time of the commencement of the action. The following is the history of the occupation of said premises as shown by the evidence :

On the eighteenth of May, 1870, Samuel Crim was put in possession by the Sheriff of a tract of land called the Elsessor Tract, containing between 90 and 100 acres. The demanded premises are a part of this tract. The next day, May 19, 1870, Crim made a lease of the premises to Peter McGrath and one Mallory for the term of six months. These lessees

were at the time in possession of the property. The following day, May 20, 1870, Crim executed a deed to the appellant Roper of the entire tract, except Blocks 757, 684 and 780. Mallory does not appear to have remained on the premises. Peter McGrath, the other tenant, remained there until the beginning of the year 1872, when he went to Pope Valley, in Napa County, to live. He remained there until some time in September, 1873. This action was commenced June 5, 1873. On the thirty-first of December, 1872, Edward Roper executed a lease of the premises to William McGrath, a son of Peter. At that time Peter was superintendent of a quicksilver mine in Pope Valley. William McGrath has, ever since the execution of the lease to him, continued in possession of the premises. He, and not Peter, was in possession at the time when this action was commenced, in June, 1873. It is not pretended by counsel for respondent that Peter McGrath was on the premises when this action was commenced, or that he was not living in Pope Valley, or that he was not superintendent of the quicksilver mines for nearly two years, from the beginning of 1872 to September 1873; but it is claimed by them that, notwithstanding Peter's absence from the premises—notwithstanding the fact that his son, William, then in the twenty-sixth year of his age, was occupying the premises under a lease from Edward Roper, he, Peter McGrath, was still in possession, ousting the plaintiff and preventing him from taking possession of the property.

There is no evidence that Roper was ever in possession of the premises. His only connection with the property is that he received a deed from Crim of the premises, except blocks 757, 684, and 780, and executed the lease to William McGrath in December, 1872. On the eighth of March, 1873, and three months before the commencement of this suit, Roper conveyed his interest in the premises to Alfred W. Reay.

If the deed to Roper was sufficient to put him in the constructive possession of the premises, the deed from him to A. W. Reay was sufficient to put him out again. As landlord of William McGrath he is not sued. Section 379, C. C. P., provides that "in an action to determine the title or right of possession to real property, which at the time of the commencement of the action is in the possession of a tenant,

the landlord may be joined as a party defendant." In such a case the allegation should be that the tenant-defendant is in possession, and that the other defendant is his landlord. An allegation that the landlord is in possession is not enough, for it is not he, but the tenant, who is in possession. Besides, when Roper conveyed to Reay on the eighth of March, 1873, he ceased to be landlord.

The judgment should be reversed for the failure of the Court below to find upon the issue raised by the plea of the statute of limitations. The only finding tending to cover that issue is the fourteenth, "and the said defendants had, prior to the commencement of this action, been in the possession of the said pieces and parcels of land at no time prior to the nineteenth day of May, 1870." This is no finding upon the issue. It does not find that the grantors of defendant had not been in possession prior to May 19, 1870, or that plaintiff or his grantors had been in possession within five years before the commencement of the action.

*J. H. Smyth,* for Respondent.

The first error assigned is the admission of the deed from the city to the plaintiff.

After the Act of March 8, 1866, various orders were adopted by the municipal authorities of San Francisco for carrying its purposes into effect, among others Order No. 800, which was ratified by the Legislature, (Stat. 1867–8, p. 379) and Order No. 866, which was reënacted by the Legislature (Stat. 1869–70, p. 353). By the former of these orders it was provided (Sec. 11) that upon certain events the title (without any conveyance) was released to the person named in the Act of Congress, and it was further enacted by the Legislature that "all proceedings heretofore had and which have taken place, or shall hereafter take place, under its provisions are ratified and confirmed."

And by the Act of March 14, 1870, all orders conflicting with Order No. 866 are repealed, but it was expressly declared (Sec. 6) that "such repeal shall not invalidate any of the proceedings instituted under the Order of which No. 866 is amendatory;" and also (Sec. 5), "that a conveyance exe-

cuted in pursuance of the provisions of this Act shall operate as an acknowledgment that the title to the land has passed under and by virtue of the Order No. 800."

The recitals in the deed in question show that it was a portion of the "proceedings instituted under " Order No. 866, and also that it was executed "in confirmation of " the provisions of Order No. 800, and consequently is within the operation of both of the aforesaid Acts of the Legislature.

The motion for a nonsuit was properly denied by the Court.

The motion was made upon the ground that "none of the defendants were in possession or shown to have been in possession at the time of the commencement of this action."

It was not necessary to show an actual personal occupancy of the land in order to entitle the plaintiff to recover. A constructive possession is sufficient. And if a person asserts that he is in possession, or does such acts as imply that he is in possession, or claims to be in possession, or such acts as are inconsistent with a denial of such possession, he is said to have constructive possession, in the same manner that a denial of plaintiff's title is regarded as equivalent to proof of an ouster. (*Crane* v. *Ghirardelli,* 45 Cal. 235.)

Kindred to the foregoing point is the specification in the statement that the evidence was insufficient to show that the defendants were in possession of any portion of the premises at the commencement of the action. They endeavored to show that because McGrath happened to be in Napa on the day the complaint was filed therefore he was not then in possession of the land.

The Court, however, was satisfied from the evidence on that subject that the pretended change of possession from McGrath to his son was a fraudulent and similated one, and that, in fact, his possession was continuous from the date of his entry under the lease, in May, 1870, to the time of the trial. The finding of the Court upon the conflict of evidence on this issue is conclusive on the point. (*Ellis* v. *White,* 47 Cal. 75.)

As was said by this Court, upon a similar attempt by a father to abandon his possession in favor of his son who was living with him, "Courts would cease to be courts of justice

if such proceedings were countenanced." (*Keller* v. *Berry,* 6 P. C. L. J. 864.)

The finding that the plaintiffs have been seised in fee and the owners of the premises since the sixth day of April, 1870—the action having been brought in 1873—is a sufficient finding on the issues of the statute of limitations. (C. C. P. § 321; *S. F.* v. *Fulde,* 37 Cal. 349.)

It will be noticed that the answer only pleads the provisions of Sections 318 and 319 of the Code of Civil Procedure, which in no way refer to any possession by the defendants; and in the absence of any allegation on that point, it was unnecessary to find thereon.

Ross, J.:

The lands in controversy in this action, and in a number of other actions now pending before us, form a part of what was known as the "outside lands" of the City and County of San Francisco. After the passage of the Act of Congress of March 8, 1866, in relation to those lands, the Board of Supervisors passed, among other orders, Order No. 866, by which provision was made for the presentation of petitions by the respective claimants, the making of proofs, the making and publication of awards of the land, to be followed by deeds by the Mayor. It is contended on behalf of the appellants that this Order—No. 866—was never authorized or ratified by the Legislature, and that, as a result, the deeds issued by the Mayor pursuant to its provisions were unauthorized and void.

In effect Order 866 was ratified and re-enacted by the Act of the Legislature approved March 14, 1870. (Statutes 1869-70, p. 353.) By the first, second, third, fourth and fifth sections of that Act the order was substantially re-enacted, and by the sixth section the Legislature repealed all Orders and parts of Orders of the Board of Supervisors conflicting with Order 866, accompanying the repeal, however, with the proviso that such repeal should not invalidate any of the proceedings instituted under the Order of which Order 866 was amendatory, and expressly authorized such proceedings to be continued under the provisions of said Order 866. This was in effect a legislative ratification of the provis-

ions of Order 866, for it can not be held that the Legislature intended to authorize any proceedings to be conducted under an unauthorized or invalid Order. Besides the whole scope of the Act of March 14, 1870, manifests the intent on the part of the Legislature to ratify and continue the provisions of Order 866. The intent is manifested, in the first place, by the repeal of all Orders and parts of Orders in conflict with it, with the saving clause that all proceedings instituted under the Order of which it was amendatory should be unaffected by the repeal and be *continued under its provisions;* and, in the second place, by the *re-enactment* in statutory form of the provisions of the said Order.

Our conclusion is, that the deeds under which the plaintiff claims were not unauthorized, and that they were properly admitted in evidence. (*McCreery* v. *Sawyer,* 52 Cal. 257; *Le Roy* v. *Cunningham,* 44 id. 609; *Kraft* v. *Driscoll,* 1 P. C. L. J. 24.) We have looked into the evidence, and cannot say the findings of the Court of possession of the premises by the appellants at the time of the commencement of the action, was not justified. As respects the finding in relation to the statute of limitations, it is sufficient to say that if there was a plea of the statute, the finding covered it.

Judgment and order affirmed.

McKINSTRY and McKEE, JJ., concurred.

*Paul Rousset et al.* v. *J. W. Reay et al.,* No. 6984; *Theodore Lieberman* v. *J. W. Reay et al.,* No. 6983; *Simon Held* v. *J. W. Reay et al.,* No. 6984; *William Thurmauer* v. *J. W. Reay et al.,* No. 6985; *E. S. Freeman* v. *J. W. Reay et al.,* No. 6986; *William J. Adams* v. *J. W. Reay et al.,* No. 6987; *J. M. Forrest* v. *J. W. Reay et al.,* No. 6988; *Patrick F. Butler* v. *J. W. Reay et al.,* No. 7282; presenting the same points and argued by the same counsel as *Rousset* v. *Reay* (No. 6891) *supra,* were affirmed on the authority of that case.